**Henry T. SANDERS, Plaintiff-Appellee,**

v.

**JOHN NUVEEN & CO., INC., et al., Defendants-Appellants.**

**Nos. 74–2047, 75–1260.**

United States Court of Appeals, Seventh Circuit.

Argued June 13, 1975.

Decided Oct. 30, 1975.

Milton H. Cohen, Allan Horwich, Chicago, Ill., for defendants-appellants.

Richard Orlikoff, Salvatore A. Barbatano, Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice (Retired),* FAIRCHILD, Chief Judge, and STEVENS, Circuit Judge.

STEVENS, Circuit Judge.

The principal question presented is whether an underwriter of short term commercial paper, who acted in the mistaken but honest belief that financial statements prepared by certified public accountants correctly represented the condition of the issuer is liable to its customers for losses sustained as a result of the issuer's default. The district court held the underwriter liable on the theory that it breached a duty to make reasonable inquiries that would have led to the discovery of the issuer's fraud. We affirm.

The plaintiff class consists of 42 purchasers of short term notes issued by Winter & Hirsch, Inc. ("WH"), a finance company that defaulted on its obligations on February 25, 1970. All of the plaintiffs' notes, totaling $1,612,500 in face value, were purchased from the defendant, John Nuveen & Co., Inc. ("Nuveen") during the period between June 30, 1969, and February 10, 1970.

Nuveen, whose primary business for many years had been the sale of tax exempt securities, entered the commercial paper business in September of 1968

---

* Tom C. Clark, Associate Justice (Retired) of the United States Supreme Court, was sitting by designation.

by acquiring the assets of a commercial paper broker headquartered in Chicago. WH had been one of approximately 40 issuers represented by that broker. Without first making an investigation of the corporate affairs, business, or financial condition of WH, Nuveen began to underwrite and to sell commercial paper issued by WH.

Nuveen operated 17 branch offices located throughout the United States. Its entire sales force, including 172 registered representatives, was authorized to sell commercial paper. The paper which it sold, including the WH notes, was rated "Desirable" by National Credit Office, in a system in which "Prime" was the highest rating and "Desirable" was the second category. The head of Nuveen's commercial paper department testified that the paper handled by Nuveen was sold on the basis "that there should be no question but what the paper will be paid at maturity."

Nuveen customarily prepared a credit report on the issues of commercial paper which it sold; such reports on WH were given to Nuveen's customers. At least some of the reports stated that they contained information derived from a "detailed audit" of WH.

The district court found that Nuveen was an underwriter of WH commercial paper. During the period between September 1968 and February 1970, Nuveen purchased and resold substantially all of WH's short term discount notes.[1] The amount of outstanding indebtedness evidenced by such notes varied from about $1,500,000 to $4,000,000.[2] Nuveen sold WH paper to banks, insurance companies, individuals and firms throughout the United States. They were frequently "rolled over" at maturity; that is, new notes were accepted in payment of outstanding notes when they became due. The conclusion that Nuveen was an underwriter for WH is not challenged.

Nuveen made some investigation of the affairs of WH. It analyzed semiannual financial statements prepared by the certified public accounting firm of Lieber, Bleiweis & Company. Nuveen ascertained that a number of large banks had been extending millions of dollars of credit to WH for many years.[3] In March of 1969 a credit analyst employed by Nuveen spent a day at the offices of WH; he examined records relating to WH's accounts receivable and its collection procedures.

In September of 1969, Investors Diversified Services ("IDS"), through its wholly owned subsidiary, Investors Syndicate of America, Inc., acquired all the stock of Nuveen. The senior vice-president of IDS then became a director of Nuveen and a member of its Executive Committee, with special responsibility for the commercial paper operation. Thereafter, the head of Nuveen's commercial paper department had lunch with the president of WH, noticed that he appeared ill, and decided to conduct a check of WH. Accordingly, Nuveen personnel again re-

---

1. The district court found that between September 1, 1968, and February 10, 1970, except for two notes in the face amount of $60,000, Nuveen purchased all the commercial paper issued by WH. Occasionally, as at the time of the default, Nuveen had some of WH paper in its own portfolio.

2. Thus, the amount of WH commercial paper issued and outstanding in 1968 ranged from a low of $1,915,000 in January to a high of $4,064,500 in April. The amount outstanding at the time of the default in February 1970 was $1,661,500 in face value represented by 56 notes held by 44 different firms or individuals.

One note was then held by Nuveen and another holder elected to opt out of the class. Accordingly, the 42 members of the class asserting claims in this litigation held a total of $1,612,500 in WH notes.

3. Among those banks, with the amount of the line of credit for each bank, were The First National Bank of Chicago ($1,750,000), Chase Manhattan ($1,750,000), Continental Illinois National Bank and Trust Company of Chicago ($1,500,000), National Bank of Detroit ($1,250,000), Central National Bank of Chicago ($1,250,000), and Harris Trust & Savings Bank ($1,000,000).

viewed the most recent Lieber, Bleiweis statements, and in mid-January of 1970, letters of inquiry were sent to 10 banks. The responses were either neutral or favorable.

Nuveen never made any request to examine WH's tax returns, its corporate minutes, or its contracts. Nuveen did not meet with any representative of Lieber, Bleiweis and made no request to see any working papers used in the preparation of its semiannual statements.

In January of 1970, two lenders who had heard rumors about the Lieber, Bleiweis audits of WH, insisted that WH retain a new accounting firm to conduct an audit as of January 31, 1970. The new accounting firm was retained on January 12, 1970. Those accountants promptly discovered that no federal income tax return had been filed for the fiscal year ended August 31, 1969; that Lieber, Bleiweis work papers were either not in existence or not available; and that the general ledger of WH could not be reconciled with the August 31, 1969, statement of net worth in the Lieber, Bleiweis audit. In due course, the accountants discovered a $14,000,000 deficiency in the accounts receivable and unrecorded indebtedness of $1,750,000. WH was hopelessly insolvent—a fact which had been concealed by the falsification of records by WH and Lieber, Bleiweis for a period of at least 10 years.[4]

On February 10, 1970, Nuveen first heard the rumors about WH and, as a result of inquiries, also learned that a fresh audit of WH was being made. Nuveen immediately ceased the sale of WH commercial paper and sold none thereafter. The WH notes then outstanding were not paid.

On March 12, 1970, plaintiff Henry T. Sanders filed this class action against Nuveen, the corporations directly and indirectly in control of Nuveen,[5] and nine individuals.[6] The complaint as amended principally alleged that the defendant Nuveen violated the federal securities laws by selling WH commercial paper without first making an investigation of WH sufficient to satisfy Nuveen's duty as an underwriter,[7] and the Rules of Fair Practice of the National Association of Securities Dealers, Inc., by failing to establish written procedures for the sale of commercial paper and failing properly to train and supervise its salesmen. The other defendants are alleged to be liable as "controlling persons" of Nuveen.

The district court denied defendants' motion to strike certain critical allegations and then certified to this court the question whether the WH commercial paper was a "security" within the meaning of the Securities Exchange Act of 1934. We answered that question in the affirmative[8] and remanded the case for trial.

---

4. Ultimately, the principals of WH and Lieber, Bleiweis pleaded guilty in the federal district court to criminal charges and received jail sentences and fines.

5. The defendants, Investors Diversified Services, Inc., Investors Syndicate of America, Inc., and Alleghany Corporation, are involved only as alleged "controlling persons" with regard to Nuveen. Thus, they can be held liable under § 20 of the Securities Exchange Act, 15 U.S.C. § 78t, only if Nuveen is first found to be liable.

6. Two defendants were dismissed by stipulation based on facts not known to the plaintiff at the time of filing suit. All remaining individual plaintiffs were dismissed without prejudice, with the approval of the district judge; in connection with the dismissal IDS guaranteed

any judgment which might be entered against Nuveen.

7. In particular, the amended complaint asserts claims under Sections 12(2) and 17 of the Securities Act of 1933, 15 U.S.C. §§ 77l(2) and 77q; Sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t; and Rule 10b–5 of the Securities and Exchange Commission, 17 CFR 240.10b–5.

8. *Sanders v. Nuveen*, 463 F.2d 1075 (7th Cir. 1972), *cert. denied* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (*Sanders I*). Defendant has asked us to reconsider that holding or, alternatively, to hold that the WH notes sold to banks by Nuveen were not securities even if notes sold to individuals were. Since the findings establish the factual basis for the conclusion

After trial the district court made detailed findings of fact and entered judgment for plaintiffs. The court concluded that Nuveen had a duty as an underwriter to make a reasonable investigation of WH and that, in the circumstances of this case, such an investigation would have revealed the fraud. Defendants appeal, primarily contending that Nuveen acted reasonably and did not violate any statutory duty to its customers.

## I.

### Appeal No. 74–2047

■ We think appellants are correct in arguing that Nuveen's liability in this case must rest on Rule 10b–5.[9] Section 11 of the Securities Act of 1933 is inapplicable because no registration statement was filed,[10] and we do not rely on § 12(2) of that Act because the district court did not find any violation of that section.[11] We also agree with appellants that the evidence does not indicate that all members of the class relied on express recommendations by Nuveen. Moreover, for purposes of decision we accept appellants' argument that the

Lieber, Bleiweis audit was appropriately certified and nothing in the audits themselves gave Nuveen any special reason to question their accuracy.[12] Finally, we deliberately avoid any extended discussion of the broad question whether there is a generally applicable standard of culpability in Rule 10b–5 cases lying somewhere between the extremes of common law fraud on the one hand[13] and mere negligence on the other.[14] We assume the standard may be phrased differently in different circumstances.[15]

In this case, the result is controlled by a few critical facts. Defendant Nuveen was an underwriter of WH commercial paper. Although Nuveen was unaware of the fraud perpetrated by WH and Lieber, Bleiweis, a request to examine federal income tax returns, corporate minute books and accounting work papers—or indeed any one of these sources of information—would have revealed the fraud or at the very least would have revealed deficiencies that would have mandated further inquiry.

■ Nuveen's status as an underwriter is significant for two reasons. An

expressed in *Sanders I,* the rationale of Judge Sprecher's opinion clearly requires rejection of both of these requests.

9. "17 CFR § 240.10b–5. Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

10. By its terms § 11 defines liability for misstatements or omissions in registration statements.

11. Plaintiff argued on appeal that the credit reports on WH disseminated by Nuveen were prospectuses within the meaning of the Act. The district court made no such finding.

12. Nor need we decide whether plaintiff's losses could fairly be attributed to Nuveen's apparent violation of Rule 27 of the Rules of the National Association of Securities Dealers, Inc., requiring enforcement of written procedures for the sale of securities.

13. The rationale of this circuit's selection of the appropriate state statute of limitations to apply to 10b–5 actions rests on the premise that 10b–5 authorizes recovery despite the absence of the kind of *scienter* necessary to sustain a common law fraud claim. See *Parrent v. Midwest Rug Mills, Inc.,* 455 F.2d 123 (7th Cir. 1972).

14. See *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974); *Bucklo, Scienter and Rule 10b–5,* 67 Nw.U.L.Rev. 562 (1972).

15. Even scholars searching for a generally applicable black letter rule acknowledge the need for specific exceptions based on the nature of a particular business relationship. See Bucklo, *supra,* n. 14, at 595.

underwriter's relationship with the issuer gives the underwriter access to facts that are not equally available to members of the public who must rely on published information. And the relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security. Because the public relies on the integrity,[16] independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security.[17] And since the under-writer is unquestionably aware of the nature of the public's reliance on his participation in the sale of the issue, the mere fact that he has underwritten it is an implied representation that he has met the standards of his profession in his investigation of the issuer.[18]

 Nuveen argues that the underwriter's duty of disclosure is limited to "facts which he knows and those which are reasonably ascertainable."[19] That statement of the standard as applied to a

---

**16.** In *Feit v. Leasco Data Processing Corporation,* 332 F.Supp. 544, 581 (E.D.N.Y.1971), the court noticed that:

> "The average investor probably assumes that some issuers will lie, but he probably has somewhat more confidence in the average level of morality of an underwriter who has established a reputation for fair dealing."

**17.** In a case arising under § 14 of the 1934 Act, Judge Timbers wrote at length about the special responsibilities of underwriters, stating:

> "The investing public properly relies upon the underwriter to check the accuracy of the statements and the soundness of the offer; when the underwriter does ηot speak out, the investor reasonably assumes that there are no undisclosed material deficiencies.

> \* \* \* \* \* \*

> "Self-regulation is the mainspring of the federal securities laws. No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so. He is familiar with the process of investigating the business condition of a company and possesses extensive resources for doing so. Since he often has a financial stake in the issue, he has a special motive thoroughly to investigate the issuer's strengths and weaknesses. Prospective investors look to the underwriter—a fact well known to all concerned and especially to the underwriter—to pass on the soundness of the security and the correctness of the registration statement and prospectus." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 370 (2d Cir. 1973).

**18.** Whether reviewing the underwriter's duty to investigate under the standards of § 11 applicable to registration statements or under the standards of Rule 10b–5, the following comment by Judge McLean is pertinent:

> "To effectuate the statute's purpose the phrase 'reasonable investigation' must be construed to require more effort on the part of the underwriters than the mere accurate reporting in the prospectus of 'data presented' to them by the company. It should make no difference that this data is elicited by questions addressed to the company officers by the underwriters, or that the underwriters at the time believe that the company's officers are truthful and reliable. In order to make the underwriters' participation in this enterprise of any value to the investors, the underwriters must make some reasonable attempt to verify the data submitted to them. They may not rely solely on the company's officers or on the company's counsel. A prudent man in the management of his own property would not rely on them." *Escott v. BarChris Construction Corporation,* 283 F.Supp. 643, 697 (S.D.N.Y. 1968).

**19.** As we understand Nuveen's argument, Nuveen would acknowledge an obligation to comply with the standard applicable to a broker-dealer who had recommended the purchase of a security. That standard was described as follows in *Hanley v. S. E. C.,* 415 F.2d 589, 597 (2d Cir. 1969):

> "In summary, the standards by which the actions of each petitioner must be judged are strict. He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information."

broker-dealer would justify reliance on published data. But a greater quantity of information is "reasonably ascertainable" by an underwriter than by a mere broker, and something more than published data must be analyzed if an underwriter is to discharge his duty of investigation. In this case, the district court correctly found that Nuveen's investigation of WH was deficient and that an appropriate investigation would have revealed the fraud.

In reaching this conclusion we have taken into consideration the fact that the security was short term commercial paper rather than stock or long term indebtedness. The nature of this security minimized the investor's interest in the long range prospects of the issuer and therefore would justify a lesser consideration by the underwriter of such matters as growth prospects and dividend policies. On the other hand, the fact that the investor's concern was limited to the issuer's ability to pay its bills in the immediate future enhanced the importance of determining the basic integrity of the issuer's financial statements. Although the underwriter cannot be a guarantor of the soundness of any issue, he may not give it his implied stamp of approval without having a reasonable basis for concluding that the issue is sound.

Nuveen forcefully argues that its reliance on the Lieber, Bleiweis audits was reasonable because the leading banks in the country, which had extended millions of dollars of credit to WH over a period of many years, also relied on the same information (or misinformation). There are two answers to this argument.

First, the reasonableness of a bank's credit investigation procedures is not before us and is not to be judged under the standards of the Federal Securities Acts; we are concerned only with the duty of the underwriter to comply with the requirements of statutes and regulations designed to protect the investing public. Second, even if we should assume that the banks are subject to the same standards as an underwriter, the fact that their practices may have been considered acceptable by the banking industry would not convince us that they meet the standards imposed by the relevant statutes and regulations.[20]

No doubt there are cases in which an issuer may perpetrate a fraud which will escape detection notwithstanding a reasonable investigation by an underwriter. Experience teaches us that fraud can be skillfully hidden. But this was not such a case. The indications of questionable practices by WH were easily accessible to a competent underwriter with a question of fraud in mind. Even though WH was an old established firm with a fine reputation, that fact cannot justify the conclusion that an underwriter's investigation which entirely ignored the possibility of fraud was reasonable. The underwriter is under a duty to make at least some investigation directed at the question whether the ever present possibility of fraud is in fact a reality. The district court correctly concluded that Nuveen breached that duty.

## II.

The three remaining defendants are corporations which have controlled Nuveen since September 15, 1969.[21]

20. We recently quoted the following excerpt from Judge Hand's opinion in *The T. J. Hooper*, 60 F.2d 737, 740 (2d Cir.):

"Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission."
See *Hochfelder v. Ernst & Ernst*, 503 F.2d 1100, 1113 (7 Cir. 1974).

21. They are Investors Syndicate of America (ISA) which from September 15, 1969, until some time after the events in this case owned 100% of the stock of Nuveen; Investors Diversified Services (IDS), which owns all of the stock of ISA; and Alleghany Corporation,

They are jointly and severally liable for Nuveen's violation unless they "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation . . . " within the meaning of § 20 of the Securities and Exchange Act of 1934.[22] The "act" involved here is Nuveen's failure to make a proper investigation of WH.

The district court found that, following the acquisition of Nuveen on September 15, 1969, IDS caused its senior vice-president, Kenneth Wahlberg, to become a member of the board of directors of Nuveen, and a member of a three-man executive committee established to conduct and supervise Nuveen's operations. Wahlberg was experienced in buying commercial paper; Richard Frank, the executive vice-president of Nuveen, testified that Nuveen looked to Wahlberg for expert guidance and direction in conducting Nuveen's commercial paper operations.[23] In December, 1969, Wahlberg, as a member of Nuveen's executive committee, reviewed the commercial paper sold by Nuveen and participated in the committee's decision that Nuveen would continue to sell the notes issued by WH. These facts show a direct involvement by Wahlberg in the actual conduct found wrongful here—the underwriting of WH paper without conducting a reasonable investigation.[24] Since he was a senior executive acting on behalf of IDS and ISA, these corporations are liable as "controlling persons."

■ The situation is rather different as regards Alleghany Corporation. Alleghany is primarily an investor. Although it was in control of IDS by virtue of its 40% stock ownership and because officers and directors of Alleghany acted as officers and directors of IDS, it was never shown that Alleghany took any active part in the management of Nuveen; rather, it delegated this task to IDS. The judgment against Alleghany should therefore be reversed.

### III.

### Appeal No. 75–1260

After entry of the judgment appealed from in No. 74–2047, the district court

which owns more than 40% of the stock of IDS.

**22.** That section provides:

"§ 78t. Liabilities of controlling persons
 (a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good 'aith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 (b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.
 (c) It shall be unlawful for any director or officer of, or any owner of any securities issued by, any issuer required to file any document, report, or information under this chapter or any rule or regulation thereunder without just cause to hinder, delay, or obstruct the making or filing of any such document, report, or information."
15 U.S.C. § 78t.

**23.** Wahlberg also testified that in October, 1969, instructions were given to hire a credit investigator in the commercial paper department as additional personnel Wahlberg felt was needed.

**24.** This is a very different situation from that in *Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir. 1973) (en banc). There, a partner in Drexel & Co., a securities dealer with a director of BarChris Construction Co. Officers of BarChris made certain misrepresentations to the plaintiff in arranging a merger of the plaintiff's company into BarChris. Plaintiff sought to hold Coleman liable as a director, and Drexel & Co. liable as his employer. However, Coleman was not present at the meeting where the misrepresentations were made, and he inquired of one of BarChris's officers who affirmatively misled him.

Here, Wahlberg, on behalf of IDS and ISA, was an executive with direct responsibility for the extent of Nuveen's investigation. Although he relied on Nuveen's "fine reputation," he knew what investigations were, or were not, actually being made.

heard objections from defendants-appellants on issues relating to particular claims. On January 27, 1975, the district court entered a final order overruling all such objections not previously withdrawn or ruled upon. On February 21, 1975, defendants' notice of appeal on these issues was entered. We deal with these issues individually.

### A.

Appellants contend that the district court erred in failing to require the individual members of the plaintiff class to show (a) whether they had received any recommendation or report from Nuveen on WH; (b) whether each class member's purchase represented a commercial or an investment transaction; and (c) the degree of knowledge which each class member possessed regarding WH at the time of purchase.

■ The disposition which we have made of the liability issue disposes of the first contention; as an underwriter selling the WH notes, Nuveen made an implied representation that it had reasonable grounds for belief that these notes would be paid at maturity. Of necessity, this "representation" was made to all purchasers from Nuveen. *Cf. Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–153, 92 S.Ct. 1456, 31 L.Ed.2d 741, rehearing denied 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 and 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972). Since it can fairly be inferred that no member of the plaintiff class would have bought the notes had he known, as Nuveen could easily have discovered, that WH's financial records were fraudulent, the representation was material and provides the basis for recovery by the entire class.

■ The appellants' contention that each of the banks which was a member of the plaintiff class should have been required to show that it acquired the note or notes in question as a result of an investment rather than a commercial transaction is also without merit. Plaintiffs have shown that these notes were acquired from Nuveen, and not as part of a direct loan transaction with WH. Since the notes were marketed as securities, see *Sanders I, supra,* at 1080, this is sufficient to bring the bank within the protection of the Securities Act. *Cf. Lehigh Valley Trust Co. v. Central National Bank of Jacksonville,* 409 F.2d 989, 992–993 (5th Cir. 1969).

■ Nor is it material, short of a showing of actual knowledge of the fraud, what knowledge any plaintiff had. about WH. The unsophisticated and unwary are not the only beneficiaries of the federal securities laws. See, e. g., *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680 (5th Cir. 1971); *S. E. C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied sub nom. Kline v. S. E. C.,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). There has not been (save in the special case of National Stock Yards National Bank, discussed below) any suggestion that any plaintiff actually knew of the fraud at the time it purchased the securities.[25]

### B.

The defendants object to recovery by National Stock Yards National Bank and Capitol Bank of Springfield on the grounds that (1) both are *in pari delicto* with Nuveen, and (2) as to National, it reacquired the notes after it had actual notice of the fraud. Neither of these objections is well taken.

■ National and Capitol purchased notes from Nuveen which they then resold to correspondent banks. However, it is clear that National and Capitol were acting as agents for their correspondent banks, and not as underwriters as was

---

**25.** Since no showing of individual reliance or general ignorance of WH was required, the district court did not abuse its discretion in denying defendants' motion to serve interrogatories on certain members of the plaintiff class after judgment on the common issues.

Nuveen.[26] Thus, they did not share Nuveen's duty to investigate and cannot be considered to be *in pari delicto* with Nuveen.[27]

Appellants also contend that National should be barred from recovering because it repurchased the notes after it had actual knowledge of the fraud.

National has filed a claim in this case as the holder of seven WH notes. National purchased those notes between November 1969 and January 1970 as agent for seven smaller banks for which it acted as correspondent. National paid Nuveen for the notes and either debited the accounts of the smaller banks for the amounts in question or was paid by them. National retained the notes for safekeeping. After being notified of the problem with WH, National repurchased the notes from its correspondent banks.

 Appellants contend that National's repurchase of the notes after it had knowledge of the fraud bars it from recovery, apparently on the theory that any loss which National incurred was a result not of Nuveen's misconduct, but of National's knowing assumption of risk. If National had made its purchase *from Nuveen* despite knowledge of material adverse facts, the contention would have some force. But here National merely acted to protect the seven correspondent banks from loss on the notes which National had chosen for them. That action did not enlarge Nuveen's potential liability, but merely had the effect of substituting National for the seven banks as the injured party. To hold that National could not recover

in this situation would be to frustrate the purpose of the securities acts to protect innocent investors—here, the seven correspondent banks—because it would tend to deter such repurchase by intermediate banks. Appellants have also argued, in attempting to put forward a defense of *in pari delicto,* that National had a legal duty to reimburse the correspondent banks. While we have found that National was not an underwriter, this does not foreclose the possibility that National was liable to its correspondents on some other basis. In that case, of course, National's loss would have been the same whether it voluntarily repaid the correspondents, or was forced to do so by legal action. In either case, National's loss was a direct result of Nuveen's sale of the notes without a reasonable basis to believe that they would be paid when due.[28]

### C.

 Appellants object to the claim of Dimmy Andrews on the ground that he had previously opted out of the action. The record shows that Andrews wrote a letter opting out; that he "intended" to send it to the court, although he could not remember whether it was actually mailed; that a carbon copy of the letter was sent to and received by Nuveen, but that there was no record of the letter ever having been received by the court. There was also some evidence to show that Andrews decided to opt out on the advice of a Mr. Stuart, an employee of Nuveen. On these facts, the district court found that Andrews had not effectively opted out of the class.

**26.** National and Capitol made no "public distributions," they did not solicit orders for these notes, and they received no compensation for their services in purchasing them.

**27.** Because we deem the *in pari delicto* issue to be meritless on the facts, we do not reach the question whether it was, in the circumstances, raised too late to be considered. Although the issue of *in pari delicto* goes to the question of liability, it was not an issue common to all members of the class.

**28.** Appellants also suggest that National cannot recover because it is not properly a member of the class, since it did not own the notes on February 23, 1970. However, National was always included in the list of class members and received all notices. Appellants did not raise the point until after the decision on the merits, so there was no opportunity to correct what may have been a self-contradictory class description. And in any case, exclusion of National from the class at this point would not defeat a separate action by National since the statute of limitations has been tolled during the pendency of the class action. *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713.

With some misgivings, we conclude that the district court did not abuse its discretion in so holding. Courts have been flexible in recognizing elections to be excluded from a class which were communicated to the court, although not in the proper form. *In re Four Seasons Securities Law Litigation,* 493 F.2d 1288 (10th Cir. 1974); *Bonner v. Texas City Independent School Dist. of Texas,* 305 F.Supp. 600 (S.D.Tex.1969). However, in this case, no communication was actually received by the court until after the adjudication on the merits. Thus, while the question is a close one in view of the obvious dangers of "one-way intervention," we cannot say that the district court exceeded its broad discretion.

## IV.

■ Appellants argue that the award of prejudgment interest was erroneous because the trial court failed properly to weigh the equities between the plaintiffs and the defendants. It is true that the award of prejudgment interest is responsive to considerations of fairness. *Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403. But the imposition of prejudgment interest is in its origin a form of compensation, not a penalty. As the Supreme Court said in *Rodgers v. United States,* 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3:

> As our prior cases show, a persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained.

Thus, if a defendant has deprived the plaintiff of a specific sum of money, he has also deprived the plaintiff of the interest which the money would have earned in the absence of defendant's breach of duty; unless the plaintiff is paid interest for the entire time that he is deprived of the use of his money, he will not receive full compensation.

■ Nevertheless, for various reasons it may be inequitable to impose such an extra payment on the defendant. For example, if final judgment is unreasonably delayed due to the actions of the plaintiff, interest should be suspended for the period of the delay. Or, if the interest would in effect act as a penalty on a relatively innocent defendant, the court has discretion to refuse to award interest. *Compare Blau v. Lehman,* 368 U.S. 403, 82 S.Ct. 451, with *Norte & Co. v. Huffines,* 416 F.2d 1189 (2d Cir. 1969), cert. denied *Muscat v. Norte & Co.,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396.

■ In this case, the award of interest was proper. Plaintiffs suffered the loss of use of the money which they had invested in WH notes (except for the portion recovered from the WH Liquidating Trust). The extended delay between the loss and final judgment was not caused by any dilatory tactics by the plaintiffs. And there are no countervailing equitable considerations making the award unfair to Nuveen. It is true that Nuveen had no actual knowledge of the fraud, but we have nonetheless held that Nuveen is responsible for serious omissions in the performance of its statutory duty as an underwriter. Although Nuveen did not receive the money which the plaintiffs lost, recovery is predicated on compensation of the victim, not on a surrender of unjustified profits. Nuveen aided in setting up the liquidating trust which gave partial recovery to the plaintiffs, but Nuveen has had the benefit of the trust in that all payments from the trust have reduced Nuveen's liability. The district court was thus correct in awarding prejudgment interest.

■ The rate allowed, however, was incorrect. In line with the underlying principle of compensation, the rate allowed should be chosen to reflect the rate which the money would have earned

for the plaintiffs had defendants not breached their duty. The theory of this case is that if Nuveen had not breached its duty, plaintiffs would never have purchased the notes in question. Thus, the rate of interest on the WH notes cannot be a correct gauge of what the plaintiff's money would otherwise have earned. That rate is wholly speculative, and therefore the legal judgment rate should have been used.

For the reasons explained above, the judgment of the district court is affirmed in part, reversed in part, and the cause is remanded to the district court for entry of judgment consistent with this opinion. The costs of this appeal are to be taxed in full against all defendants-appellants except Alleghany Corporation.