Henry T. SANDERS et al.,
Plaintiff-Appellees,

v.

JOHN NUVEEN & CO., INC., Investors
Diversified Services, Inc. and Investors
Syndicate of America, Inc., Defendants-
Appellants.

Nos. 79–1192, 79–1248 and 79–1657.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1979.

Decided April 29, 1980.

Rehearing Denied May 30, 1980.

Allan Horwich, Chicago, Ill., for defendants-appellants.

Richard Orlikoff, Chicago, Ill., for plaintiffs-appellees.

Before TONE and WOOD, Circuit Judges, and DUMBAULD, Senior District Judge.*

TONE, Circuit Judge.

The issue we decide on this appeal is whether plaintiff class members have established their claims under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2). Holding that they have, we affirm the district court's judgment in their favor.

The case has been here three times previously. 463 F.2d 1075 (7th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972) (*Sanders I*); 524 F.2d 1064 (7th Cir. 1975), *vacated and remanded*, 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976) (*Sanders II*); 554 F.2d 790 (7th Cir. 1977) (*Sanders III*). It is enough at this point to say that our affirmance in *Sanders II* of the judgment in plaintiffs' favor based on § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), was rendered untenable by the holding of the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that scienter is an element of a private cause of action under § 10(b); and that in *Sanders III* we therefore remanded the case to the district court primarily for a determination of plaintiffs' claims under § 12(2) of the 1933 Act.[1] On remand that

---

* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, is sitting by designation.

1. We left it to the discretion of the district court whether to allow amendment to add allegations of violation of § 12(1) of the 1933 Act. *See* 554 F.2d at 798–99. That court allowed amendment and decided the § 12(1) issue in

court held an evidentiary hearing[2] and then made additional findings in favor of plaintiffs and entered judgment accordingly.

The background facts having been stated in detail in *Sanders II* and revisited in *Sanders III*, we shall do no more here than summarize those facts that are now material.

Plaintiff class consists of forty-two purchasers of unsecured short term promissory notes aggregating $1,612,500 issued by Winter & Hirsch, Inc. (WH), a consumer finance company. The purchases were made from John Nuveen & Co., Inc. during a seven-month period immediately preceding WH's default on the notes in February 1970. The defendants other than Nuveen are corporations found to be controlling persons of Nuveen.

Nuveen was the exclusive underwriter of the WH notes, which were sold, like other commercial paper, through its branch offices throughout the United States. As the underwriter, it bought the notes from WH and resold them to customers at a profit. According to the head of Nuveen's commercial paper department, Nuveen sold commercial paper, including the notes of WH, on the basis "that there should be no question but what the paper will be paid at maturity."

Nuveen prepared and circulated to prospective customers "commercial paper reports" on the WH commercial paper that it held for sale. Three members of the plaintiff class testified to having received copies of these reports before they bought WH notes. Two other members testified to having received commercial paper reports, but could not swear to having received them before making their purchases. Nine class members, including the three who had received reports before purchasing, testified that, when they bought their WH notes, Nuveen salesmen made oral statements about the quality of the notes. There was no evidence of oral communications to any other class members. All class members received the usual written confirmations advising them that they had purchased certain described notes and that Nuveen had sold the notes as principal.

WH's default was the product of a fraud it perpetrated with the connivance of the certified public accountants who audited its financial statements and rendered opinions thereon. In summary, over a period of ten years WH continually issued financial statements in which accounts receivable were overstated and some of its indebtedness was omitted. By 1970 WH's financial statements overstated accounts receivable by some $14,000,000 and failed to reflect some $1,750,000 of indebtedness. When the notes in issue in this case were purchased by members of the plaintiff class, WH's liabilities exceeded its assets.

Nuveen was not aware of the fraud and held "the mistaken but honest belief that financial statements [of WH] prepared by certified public accountants correctly represented the condition of" WH. 524 F.2d at 1066. It accordingly proceeded to sell the WH notes and also to issue commercial paper reports thereon that reflected the false WH financial statements.

*Sanders II* held that Nuveen failed to make a reasonable investigation, which it was the duty of an underwriter to make under § 10(b) of the 1934 Act, and that such an investigation "would have revealed the fraud." *Id.* at 1071.

---

favor of the plaintiff class. Because § 12(1) is merely an alternate ground of recovery and we hold in favor of the class on the § 12(2) issue, we do not reach the § 12(1) issue. For the same reason we need not rule on defendants' argument that the district court abused its discretion on remand in allowing plaintiffs to amend the complaint to allege violation of § 12(1).

2. Defendants argue that inasmuch as the § 12(2) claim was before the district court in May 1974, when the case was tried, plaintiffs should have offered at that time all their evidence in support of that claim and should not have been permitted to offer further evidence in the proceedings upon remand after *Sanders III*. We are not unsympathetic to this argument, but we cannot say the district court abused its discretion in conducting a supplemental evidentiary hearing. Moreover, in our view of the case, the judgment should be sustained without reference to the evidence adduced at the supplemental evidentiary hearing.

After WH had dishonored the notes sold to the plaintiff class members, it was taken over by its creditors. They established the WH Liquidating Trust, liquidated WH, and over a period of time distributed the proceeds of the liquidation to creditors, including members of the plaintiff class, who received through these distributions approximately two-thirds of the amounts they paid Nuveen for the notes. The judgment appealed from is for the unpaid balance of the purchase price of the notes and prejudgment interest thereon.

## I.

Defendant's first argument is that recovery by thirty-three of the forty-two class members is defeated by the absence of evidence of receipt by them of "a prospectus or oral communication" meeting the requirements of § 12(2). That section imposes liability on

[a]ny person who—

. . . [o]ffers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . .

Liability is in favor of "the person purchasing such security from" the person who offers or sells the security. The purchaser must not have known of the untruth or omission.

Plaintiffs contend that several kinds of communications satisfied the prospectus or oral communication requirement of the statute. We need consider only one, the commercial paper reports.[3]

Defendants admit that the reports were prospectuses and that they were false and misleading. The reports repeated the false financial information contained in the WH financial statements. Also, they stated that the figures were from a detailed audit when in fact the auditors' opinions stated that no detailed audit had been made.

Defendants' only response to this argument is that, except as to the three members proved to have received copies of reports before their purchases, the reports had no "causal relationship" with the sales of the WH notes.

Although the "by means of" language in the statute requires some causal connection between the misleading representation or omission and plaintiff's purchase, defendants' interpretation of that standard is much too stringent. It is well settled that § 12(2) imposes liability without regard to whether the buyer relied on the misrepresentation or omission. *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 696 (5th Cir. 1971); *Gilbert v. Nixon*, 429 F.2d 348, 356–57 (10th Cir. 1970); *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129–30 (4th Cir. 1970). *See* Kaminsky, *An Analysis of Securities Litigation Under Section 12(2) and How It Compares With Rule 10b–5*, 13 Hous.L.Rev. 231, 258, 265 (1976). To re-

---

**3.** In addition to the commercial paper reports, plaintiffs rely upon oral statements made by Nuveen salesmen in offering the notes, the confirmations of sales sent by Nuveen to all purchasers after the sales had been agreed upon, and implied representations by Nuveen that it had conducted an ongoing investigation of WH's financial condition and found WH to be creditworthy. The testimony shows oral statements as to only nine members of the class. As to the others, plaintiffs rely on an answer to an interrogatory, but the defendants argue that the answer is not before the court. We need not resolve that dispute. The confirmations are included in the definition of prospectuses in § 2(10), 15 U.S.C. § 77b(10), but by their nature convey no information about the merit of the

security, and it may therefore reasonably be questioned whether they contain misrepresentations or suffer from omissions that meet the statutory test. Two circuits have upheld § 12(2) liability based on false implied representations. *Alton Box Board Co. v. Goldman, Sachs & Co.*, 560 F.2d 916, 922–23 (8th Cir. 1977); *Franklin Savings Bank v. Levy*, 551 F.2d 521, 527 (2d Cir. 1977); but in both cases the sufficiency of implied, as distinguished from express, misrepresentations was conceded. It is to be noted that the statute imposes liability for "a prospectus or oral communication, *which includes* an untrue statement of a material fact *or omits* to state a material fact." (Emphasis supplied.) We express no opinion on the issue suggested by this footnote.

quire a plaintiff to have received a commercial paper report before purchasing, as defendants would have us do, would tend toward erroneously imposing a reliance requirement.[4]

The statutory language, as amplified by the legislative history, indicates that a plaintiff need not prove that he ever received the misleading prospectus. The statute imposes liability in favor of a purchaser on any person who "[o]ffers or sells a security . . . by means of a prospectus or oral communication" that is misleading. Although the statute explicitly requires privity between plaintiff-purchaser and defendant-seller,[5] its terms do not require that the particular sale to an individual plaintiff be directly by means of the prospectus alleged to be misleading. The causal connection contemplated by the statute is revealed in the House Report on the bill that, after changes not relevant here, became the Securities Act of 1933. *See generally* Landis, *The Legislative History of the Securities Act of 1933*, 28 Geo.Wash.L. Rev. 29 (1959). Referring to §§ 11 and 12, the two sections imposing civil liabilities, the report declared that statements issued in connection with the sale of securities,

> although they may never actually have been seen by the prospective purchaser,

because of their wide dissemination, determine the market price of the security which in the last analysis reflects those manifold causes that are the impelling motive of the particular purchase. The connection between the statements made and the purchase of the security is clear, and, for this reason, it is the essence of fairness to insist upon the assumption of responsibility for the making of these statements.

H.R.Rep.No.85, 73d Cong., 1st Sess. 10 (1933),[6] *reprinted at 2 Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934*, Item 18 (J. Ellenberger & E. Mahar, compilers, 1973) [hereinafter cited as *Legislative History*].

Defendants argue that this is not "an open market trading case where dissemination of information to some buyers or sellers can have an impact upon the market price and thus affect transactions by people who never saw the documents." The attempted distinction lacks substance. Even though short term commercial paper is not ordinarily traded in the same way as stock and instruments of indebtedness of publicly held companies, the price it will bring depends upon the financial condition of the issuer relative to that of other issuers and the going interest rates in the money mar-

---

**4.** In *Demarco v. Edens*, 390 F.2d 836 (2d Cir. 1968), the court rejected in dictum the argument that recovery could not be had under § 12(2) because the "offering circulars" in question were not received by the buyers until after the confirmations of sales had been received. The court reasoned that such a requirement would introduce an element of reliance not mandated by the statute.

However, one could require proof of receipt of a misleading prospectus or oral communication to show not that the buyer relied on the information in deciding to purchase, but that the vendor sold the security to the individual plaintiff "by means of" the misleading communication. Indeed, in *Demarco* the defendants specifically disclaimed a reliance argument before the district court, contending instead that since the prospectus was in no way employed in the transaction, they had not sold to plaintiffs "by means of" the prospectus. Nevertheless, the district court found liability appropriate essentially as an ancillary enforcement mechanism for the SEC regulation requiring that, with respect to some securities exempted

from registration, the offering circular be sent before the confirmation. *Demarco v. Edens*, [1966–67 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,856, at 95924, 95933–34 (S.D.N.Y. Dec. 13, 1966).

**5.** Section 12(2) states that a seller is liable to "the person purchasing such security from him."

**6.** It is to be noted that the first portion of the paragraph of which the quoted passage is the second portion is a discussion of the constitutionality of imposing civil liability for actions of an intrastate character, a question presumably not relevant to § 12(2) because of that subsection's express requirement of use of interstate mails, transportation, or communications. Although appearing in the same paragraph, the portion quoted is not relevant to the constitutional question and, like other passages in the report jointly treating §§ 11 and 12, seems intended to enunciate policies underlying both sections of the Act.

ket. In that sense there is a market price. A prospectus that reports on the issuer's financial condition affects that price. In the case at bar, publication of WH's true financial condition would have caused a total collapse of the market for its notes.[7]

■ Thus, it is enough that the seller sold by means of a misleading prospectus securities of which those purchased by the plaintiff were a part.[8] The false and misleading WH commercial paper reports issued by Nuveen therefore satisfy the statute's requirement of a false or misleading prospectus "by means of" which the security was sold, regardless of whether all plaintiff class members received copies of those reports.

## II.

Defendants also argue that they have established a defense under § 12(2) by sustaining their burden of proving that they "in the exercise of reasonable care could not have known" of the claimed untruth or omission. This argument is in essence a reargument of issues decided by the opinion of Mr. Justice (then Judge) Stevens in his opinion in *Sanders II.*

Proceeding on the assumption that scienter, whether in its wilful or reckless form,[9] was not an essential element of a § 10(b) claim, *Sanders II* upheld the district court's determination that Nuveen had "breached a duty to make reasonable inquiries that would have led to the discovery of the issuer's fraud." 524 F.2d at 1066. In determining what Nuveen could reasonably have been expected to do, that opinion noted that Nuveen's status as underwriter was significant even though neither § 10(b) nor Rule 10b–5 expressly imposed a greater burden on underwriters. For instance, in response to Nuveen's argument that it needed only to discover and to disclose those facts that were "reasonably ascertainable," the standard generally applicable to broker-dealers, the court declared that,

> a greater quantity of information is "reasonably ascertainable" by an underwriter than by a mere broker, and something more than published data must be analyzed if an underwriter is to discharge his duty of investigation. In this case, the district court correctly found that Nuveen's investigation of WH was deficient and that an appropriate investigation would have revealed the fraud.

*Id.* at 1071. The court also took into account two arguments Nuveen repeats here—that it needed to make a lesser investigation because WH notes were short term commercial paper and not stock or long term indebtedness, and that its reliance on the credit lines extended by various banks to WH was reasonable.[10] The court con-

7. *Jackson v. Oppenheim*, 533 F.2d 826, 829–30 (2d Cir. 1976), which is cited by defendants, does not conflict with our holding. In that case an outside director of a corporation sued an inside director under § 12(2) for omitting certain facts from an oral communication. The discussion relied on by plaintiff, in which defendant tried to persuade plaintiff of the firm's mismanagement, occurred in the context of the inside director attempting not to sell his stock to plaintiff, but to gain plaintiff's support for changes in management. After defendant continued his efforts to effect a change in management, plaintiff, along with others apparently loyal to current management, approached defendant with an offer to buy him out, an offer that defendant accepted. The court held that defendant did not sell his stock "by means of" his prior conversation since it was "neither intended nor perceived as instrumental in effecting the sale." In the case at bar, Nuveen issued its commercial paper reports on WH as part of its effort to sell WH notes. The mis-

leading reports were instrumental to the sales at bar through their effect on the market.

8. Although the statutory language is the same with respect to misleading prospectuses and oral communications, the result might be different if only oral communications were involved. That statute's reference to an oral communication by means of which a security is sold arguably suggests a statement made to the individual buyer of the security. Spoken words lack continuing vitality and are unlikely to affect the general market price of a security. We are dealing here, however, with writings, *i. e.*, prospectuses.

9. *See Sanders III*, 554 F.2d at 792–93.

10. The *Sanders II* court assumed, as do we, that the audit reports of WH's independent accountant, on their face, gave Nuveen no reason to question their accuracy. 524 F.2d at 1069.

cluded that Nuveen was "under a duty to make at least some investigation directed at the question whether the ever present possibility of fraud is in fact a reality," and that Nuveen had breached that duty. *Id.* at 1071.

■ We find no reason to distinguish between the duty of reasonable care in the implied cause of action for negligence that was assumed to exist under § 10(b) in *Sanders II* and the duty of reasonable care expressly imposed by § 12(2) of the 1933 Act. Defendants attempt to distinguish *Sanders II* on the ground that while this court relied heavily in that case on decisions construing § 11, which explicitly requires a "reasonable investigation," § 12(2) requires only that defendants show exercise of "reasonable care." We find no significance in this difference in language in the case at bar.

It is not at all clear that Congress intended to impose a higher standard of care under § 11 than under § 12(2).[11] The difference in language appeared in the House bill and was retained in the Act as agreed to by the Joint Conference Committee and as passed by both Houses. *See* H.R. 5480, 73d Cong., 1st Sess. §§ 11 & 12 (1933), *reprinted at* 1 *Legislative History, supra,* Item 1 (bill as passed by both Houses), *and* 3 *id.*, Items 25 & 26 (bill as presented to House by its Committee on Interstate and Foreign Commerce and as originally passed by House). The Conference Committee report, in its discussion of the standard of liability imposed for a misleading registration statement, describes the standard adopted not as one of "reasonable investigation," but one of "reasonable care." H.R. Rep.No.152, 73d Cong., 1st Sess. 26 (1933) (Conference Report), *reprinted at* 2 *Legislative History, supra,* Item 19. More specifically, Congress does not appear to have

intended that a different standard apply to underwriters. Thus, the House Report draws no distinction between an underwriter's burden in the case of misleading statements in a prospectus, for which it can be liable only under § 12(2), and its § 11 duty to conduct a "reasonable investigation." H.R.Rep.No.85, 73d Cong., 1st Sess. 9 (1933), *reprinted at* 2 *Legislative History, supra,* Item 18. The difference in language can be explained not as an attempt to impose different duties of care under §§ 11 and 12, but by the fact that § 12(2) imposes the duty on all sellers of securities, while § 11 imposes liability only on specified groups of persons having such a close relationship with the registration statement that the 1933 Act, before it was amended the following year, treated them as fiduciaries. *See* Securities Act of 1933, ch. 38, § 11(c), 48 Stat. 74, 83 (1933); Securities Exchange Act of 1934, ch. 404, § 206(c), 48 Stat. 881, 907 (1934). Thus the general duty of reasonable care, the specific requirements of which are determined by the circumstances of the case,[12] was to be applied in § 11 only to persons who had a stronger connection with a registration statement than a seller necessarily has to a prospectus, so a more stringent articulation of the standard was appropriate.

■ In the circumstances of this case, the reasonable care standard required the reasonable investigation described in *Sanders II*.[13] Since what constitutes reasonable care under § 12(2) depends upon the circumstances, we, of course, do not intimate that the duty of a seller under § 12(2) is always the same as that of an underwriter in a registration offering under § 11.

### III.

■ Defendants argue in a footnote of their brief that plaintiffs failed to prove

11. We also note that the phrase "reasonable investigation" is not a prerequisite for imposition of that standard of care; the phrase relied upon does not appear in § 10(b) either, yet the *Sanders II* court found the authorities under § 11 apt.

12. The fact that § 12(2) does not expressly single out underwriters, as defined in § 2(11), 15 U.S.C. § 77b(11), for a higher standard of

liability does not mean that this status is irrelevant to determining what specific actions Nuveen need show to prove its exercise of reasonable care.

13. In reaching this conclusion, we have taken into account the fact that these securities were not registered.

they did not know of the untruth or omission. In this case, however, it is fair to presume from the fact that a plaintiff purchased the notes that he did not know the issuer was hopelessly insolvent, a fact that would have been disclosed by accurate figures. Earlier in this case, Nuveen contended specifically that at least one of the forty-two plaintiffs, National Stock Yards National Bank, knew of the fraud before purchasing. That contention was disposed of in *Sanders II.* 524 F.2d at 1074.

■ · Defendants argue in another footnote that the duty of reasonable care it owed its bank customers was not as great as the duty it owed to individuals, because banks were more sophisticated and had greater access to information about WH than individual customers. Section 12(2) does not establish a graduated scale of duty depending upon the sophistication and access to information of the customer. *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 696 (5th Cir. 1971). A plaintiff under § 12(2) is not required to prove due diligence. *See, e. g., Gilbert v. Nixon*, 429 F.2d 348, 356 (10th Cir. 1970). All that is required is ignorance of the untruth or omission.

### IV.

■ In still another footnote argument, defendants invoke the rule that a purchaser can recover under § 12(2) only from his immediate seller. *See* note 5 *supra. Hill York Corp. v. American International Franchises, Inc., supra*, 448 F.2d at 692 & n. 17, 695 & ˙ n. 24. They say this rule bars the claims of "several plaintiffs" whom they do not identify but who they assert "purchased from third parties." That assertion is supported only by a reference to an exhibit in the record that consists of a large stack of Nuveen confirmations reciting the sale of WH notes by Nuveen to various purchasers. Plaintiffs' brief ignores this footnote argument. Lacking any further guidance, we are unable to determine the basis for the assertion that several plaintiffs purchased from third parties or to say that the contrary finding implicit in the district court's judgment is erroneous.

AFFIRMED.