No. 80–299. JOHN NUVEEN & CO., INC., ET AL. v. SANDERS ET AL. C. A. 7th Cir. Certiorari denied. JUSTICE STEVENS took no part in the consideration or decision of this petition.

JUSTICE POWELL, with whom JUSTICE REHNQUIST joins, dissenting.

This securities controversy, which has been in litigation for 11 years, involves sales of commercial paper in the 1960's. The Court of Appeals for the Seventh Circuit has heard the case four times on various issues over the years, and the present petition for certiorari is the third to come before the Supreme Court. The Court today denies further review, and it is indeed long past time that this litigation should come to rest. I dissent from the denial of certiorari, however, because I believe that the Court of Appeals has seriously misapplied the Securities Act of 1933. Its decision could

affect adversely the efficiency of the Nation's short-term financing markets.

## I

John Nuveen & Co. (hereinafter petitioner) is a broker and dealer registered with the Securities and Exchange Commission (SEC). In the late 1960's, petitioner undertook to sell the short-term promissory notes—commercial paper—of Winter & Hirsch, Inc. (W&H), a consumer finance company. Relying on (i) the company's certified financial statements, (ii) responses to inquiries from banks, and (iii) a brief inspection of company records, petitioner issued a "Commercial Paper Report," similar to a prospectus, on W&H commercial paper. The report reviewed the data in certified financial statements and noted that "[t]he ratio of debt to capital funds came to 311%—Excellent! . . . Bad debts charged off came to $375,000, and recoveries in relation were $173,000—46%, an excellent showing." Respondents and other customers of petitioner made purchases.

Unknown to petitioner and to the public, W&H at the time was in serious financial trouble. W&H officers had conspired with auditors from the certified public accounting firm of Lieber, Bleiweis & Co. to tamper with the company's financial statements to make the company appear profitable. Its financial statement for 1968 showed that W&H had earned $500,000; in fact, it had lost about $1 million.

When the fraud was discovered in 1970, officials from W&H and Lieber, Bleiweis were convicted of federal fraud charges. Holders of W&H commercial paper were paid about 65 cents on the dollar. A class of plaintiffs, respondents here, sued under a variety of theories to recover the remainder. The issue presently before the Court concerns liability under § 12 (2) of the Securities Act of 1933, 48 Stat. 84, as amended, 15 U. S. C. § 77l (2), which provides, in pertinent part:

"Any person who—

"(2) offers or sells a security . . . by means of a pro-

spectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact . . . and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him . . . ."

The District Court held that petitioner was liable under § 12 (2) because it had failed to use "reasonable care" when it issued the misleading report and recommended orally to some individuals that they buy W&H paper. The Court of Appeals affirmed. *Sanders IV,* 619 F. 2d 1222 (1980).[1] It reasoned that petitioner had failed to use "reasonable care" because petitioner had not made a reasonable *investigation* of W&H's financial health. Instead, petitioner had relied principally on the certified financial statements.[2] Its inde-

---

[1] The District Court also found petitioner liable under § 12 (1) of the Act, 15 U. S. C. § 77*l* (1). The Court of Appeals did not decide whether petitioner was liable under this theory, 619 F. 2d, at 1224, n. 1, although in a prior opinion it had expressed "great doubt" about the validity of that legal theory, *Sanders III,* 554 F. 2d 790, 794 (1977).

[2] The Court of Appeals noted that petitioner had an " 'honest belief that [the] financial statements . . . correctly represented' " W&H's financial condition. *Sanders IV,* 619 F. 2d, at 1224, quoting *Sanders II,* 524 F. 2d 1064, 1066 (1975). The court assumed for purposes of its decision that the audit reports and certified financial statements were not defective on their face and that nothing in them gave petitioner any reason to question their accuracy. *Sanders IV, supra,* at 1227, n. 10. Lieber, Bleiweis represented that its audit had been conducted "in accordance with generally accepted auditing standards applicable in the circumstances and comprised such tests of the accounting records and supporting evidence and such other procedures as we considered necessary." The auditor's opinion also noted that no "detailed audit" of certain transactions had been performed. Petitioner erroneously stated in its Commercial Paper Report that Lieber, Bleiweis had performed a detailed audit. The Court of Appeals did not suggest that petitioner's error in this respect was relevant to the question of petitioner's care in relying on the data.

pendent investigation consisted of inquiries to banks and a one-day spot check of company records. The Court of Appeals thought that petitioner also should have examined the company's tax returns, its minute books, and the workpapers of the independent accountants. *Id.*, at 1228, citing *Sanders II*, 524 F. 2d 1064, 1069 (1975).

## II

Although the opinion of the Court of Appeals is not explicit, it appears to impose a duty of "reasonable investigation" rather than § 12 (2)'s requirement of "reasonable care."

## A

Section 11 (a) of the 1933 Act, 15 U. S. C. § 77k (a), imposes liability on certain persons for selling securities in a registered public offering pursuant to a materially false or misleading registration statement. A registered offering is the class of financial transactions for which Congress prescribed the most stringent regulation. The standard of care imposed on an underwriter is that it must have "had, after *reasonable investigation,* reasonable ground to believe and did believe" that the registration statement was accurate. § 11 (b)(3)(A) of the Act, 15 U. S. C. § 77k (b)(3)(A) (emphasis added).

Liability in this case was not imposed on petitioner under § 11, but under § 12 (2). Under the latter section, it is necessary for sellers to show only that they "did not know, and in the exercise of *reasonable care* could not have known," that their statements were false or misleading. (Emphasis added.)

In providing standards of care under the 1933 Act, Congress thus used different language for different situations. "Reasonable *investigation*" is required for registered offerings under § 11, but nothing more than "mer[e] . . . 'reasonable *care*' " is required by § 12 (2). Douglas & Bates, The Fed-

eral Securities Act of 1933, 43 Yale L. J. 171, 208 (1933). The difference in language is significant, because in the securities Acts Congress has used its words with precision. See, e. g., *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 198–201 (1976); *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 755, 756 (1975) (POWELL, J., concurring). "Investigation" commands a greater undertaking than "care." See Douglas & Bates, *supra*, at 208, n. 205.

In a brief filed in this case with the Court of Appeals, the SEC expressly stated that the standard of care under § 12 (2) is less demanding than that prescribed by § 11:

> "[I]t would be inconsistent with the statutory scheme to apply precisely the same standards to the scope of an underwriter's duty under Section 12 (2) as the case law appropriately has applied to underwriters under Section 11. Because of the vital role played by an underwriter in the distribution of securities, and because the registration process is integral and important to the statutory scheme, we are of the view that a higher standard of care should be imposed on those actors who are critical to its proper operations. Since Congress has determined that registration is not necessary in certain defined situations, we believe that it would undermine the Congressional intent—that issuers and other persons should be relieved of registration—if the same degree of investigation were to be required to avoid potential liability whether or not a registration statement is required." Brief for SEC in Nos. 74–2047 and 75–1260 (CA7), *Sanders III*, p. 69.

The Court of Appeals' opinion may be read as holding that petitioner's duty of "reasonable care" under § 12 (2) required it independently to *investigate* the accuracy and completeness of the certified financial statements. It was customary, however—and in my view entirely reasonable—for petitioner to rely on these statements as accurately reflecting W&H's finan-

cial condition.[3]   Even under § 11 of the Act, an underwriter is explicitly absolved of the duty to investigate with respect to "any part of the registration statement purporting to be made on the authority of an expert" such as a certified accountant if "he had no reasonable ground to believe and did not believe" that the information therein was misleading. § 11 (b)(3)(C) of the Act, 15 U. S. C. § 77k (b)(3)(C); see § 11 (a)(4), 15 U. S. C. § 77k (a)(4).   This provision is in the Act because, almost by definition, it *is* reasonable to rely on financial statements certified by public accountants.[4]   Yet, in this case, the Court of Appeals nevertheless seems to have imposed the higher duty prescribed by § 11 to investigate, but denied petitioner the right to rely on "the authority of an expert" that also is provided by § 11.[5]

---

[3] Although it appears that petitioner, in accord with general custom, relied primarily on the financial statements of the independent auditors, petitioner did take an additional precaution: it checked with the major banks that extended millions of dollars of credit to W&H. The Court of Appeals held that this inquiry was insufficient because the banks themselves may not have acted with "prudence." See *Sanders II,* 524 F. 2d, at 1071, and n. 20.   In my view, the fact that petitioner ascertained that banks with national and international reputations were extending credit to W&H is highly relevant to whether petitioner exercised reasonable care even assuming, *arguendo,* that petitioner was not entitled simply to rely on the certified financial statements.

[4] Reliance upon facially unexceptionable certified financial statements, as to the correctness of the financial data shown therein, is essential to the proper functioning of securities marketing, to the trading in securities, to the lending of money by banks and financial institutions, and to the reliance by stockholders on the reports of their corporations.   For the most part, certified public accountants faithfully have fulfilled the trust placed on them.   But where breaches by accountants occur, it is the accountants themselves—not those who rely in good faith on their professional expertise—who are at fault and who should be held responsible.

[5] Moreover, the duty to investigate imposed by the Court of Appeals rarely would uncover the type of fraud involved in this case.   According to the Court of Appeals, petitioner would have learned of the fraud if it had examined W&H's minute books, the accountant's workpapers, and company tax returns.   *Sanders II, supra,* at 1069.   I accept this

## B

The Solicitor General at this Court's request has filed a brief *amicus curiae.* He does not embrace the decision of the Court of Appeals, see *supra,* at 1009, but nevertheless suggests that we deny certiorari because, *inter alia,* courts in the future "will undoubtedly recognize" that the decision in this case is confined to its "unusual fact situation." Brief for United States as *Amicus Curiae* 7.

If it were clear that the decision fairly must be read as thus limited, I would not dissent from denial of certiorari. My concern is that the opinion of the Court of Appeals will be read as recognizing no distinction between the standards of care applicable under §§ 11 and 12 (2), and particularly as casting doubt upon the reasonableness of relying upon the expertise of certified public accountants. Dealers may believe that they must undertake extensive independent financial investigations rather than rely on the accuracy of the certified financial statements. If this is so, the efficiency of the short-term financial markets will be impaired.[6] I would grant certiorari.

---

finding, but observe that this would be most unusual. What one normally finds in minute books sheds no light whatever on the accuracy 'of audited financial statements. Nor would it be enlightening to examine the workpapers of the certified public accountants. The drafters of corporate minutes and accountants bent on fraud hardly are likely to reflect the fraud in records or papers that are easily subpoenaed. Similarly, information can be gleaned from tax returns only if they are honestly prepared. The Court of Appeals itself noted: "Experience teaches us that fraud can be skillfully hidden." *Sanders II, supra,* at 1071.

[6] Commercial paper, for example, normally is issued for periods of 30 to 90 days, and in no event more than 270 days. It is useful for borrowers with fluctuating temporary cash needs. Dealers such as petitioner buy commercial paper from issuers and resell it to investors. A dealer's compensation is the "spread" between the price at which he buys the paper from the issuer and the price charged the investor. Comment, The Commercial Paper Market and the Securities Acts, 39 U. Chi. L. Rev. 362, 367–368 (1972). The dealer's "spread" historically has been rela-

tively small. *Id.,* at 368; see Pet. for Cert. 17, n. 20. The additional expense and legal exposure made necessary by the Court of Appeals' decision will increase the "spread," and hence also the cost of borrowing.