In re FINLEY, KUMBLE, WAGNER, HEINE, UNDERBERG, MANLEY, MYERSON & CASEY, Debtor.

Bankruptcy No. 88–B–10377(PBA).

United States Bankruptcy Court, S.D. New York.

July 15, 1994.

Christy & Viener by John Cambria, New York City, for Malpractice Claimants Malpractice Representative.

Togut, Segal & Segal by Susan Balaschak, New York City, for the Successor Chapter 11 Trustee.

Skillman E. Siewert, Atlanta, Georgia, Pro Se.

## MEMORANDUM DECISION DISALLOWING CLAIM NO. 281, SKILLMAN E. SIEWERT

PRUDENCE BEATTY ABRAM, Bankruptcy Judge:

There has been no lack of diligence by the claimant in pursuing his claim. Unfortunately for the claimant, mere tenacity is not a basis for the allowance of a claim. To the extent that the claim is one for malpractice, it must be disallowed because the claimant was neither a client of the debtor law firm nor within the scope of those third parties entitled under Georgia law to assert a malpractice claim. To the extent the claim is one for common law fraud, the claim must also be disallowed because the claimant is unable to prove two required elements: first, that the debtor had the required scienter and, second, that his reliance on the debtor was justifiable. The discussion of the legal issues follows the findings of fact.

### FINDINGS OF FACT

#### The Parties

1. The claimant is Skillman E. Siewert (the "Claimant"). He is a certified public accountant and the President, Registered Principal and majority stockholder of Skillman Siewert Incorporated, a Georgia corporation (the "Corporation").[1] The Corporation did not file a proof of claim in this case.

2. The debtor, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey (the "Debtor"), was a prominent national law firm. At its height, the Debtor was the fourth largest law firm in the United States with 240 partners, 450 associates and 1000 support personnel. The Debtor had offices in New York, California, Florida, Maryland, Texas, Louisiana, Washington D.C. and London. The Debtor ceased its active operations in late 1987 and prior to the commencement of this case.

3. This case was commenced on February 24, 1988 by the filing of an involuntary Chapter 7 petition. Thereafter the Debtor filed a Chapter 11 petition. On March 4, 1988, the court converted the Chapter 7 case to a Chapter 11 case and directed the appointment of a Chapter 11 trustee.

---

1. The Corporation's principal business was marketing tax shelter investments to individual investors and CPAs. The Corporation stated in its brochure that it evaluated such tax shelter investments by engaging in "investment due diligence for southeastern investors who utilize the services of CPAs." Among other things, the Corporation was to "perform thorough due diligence with respect to an offering's underlying property(ies)" including ascertaining organization and ownership, performing physical inspections, reviewing audit procedures, interviewing management and evaluating and analyzing the financial position of the offering. Due diligence was defined in the brochure as a "securities industry term implying procedures which constitute verification, analysis and review." The Corporation was a registered securities broker/dealer and a member of the National Association of Securities Dealers, Inc. (N.A.S.D.).

4. The Chapter 11 trustee (the "Trustee") was appointed on March 7, 1988. Francis Musselman was the Trustee until shortly after the Chapter 11 liquidation plan was confirmed on December 9, 1991. Albert Togut was appointed as successor trustee.

5. The court also directed the appointment of a malpractice claimants' representative (the "Malpractice Representative") to deal with the malpractice claims and the malpractice insurance. On February 14, 1990, Arthur H. Christy was appointed as the Malpractice Representative. Among the duties of the Malpractice Representative is the obligation to review and object to malpractice claims.

### The Claim

6. The Claimant filed a claim which has been designated as Claim No. 281 (the "Claim") in which he states that the Debtor is contingently liable in the amount of $500,-000. The grounds of liability are stated as two pre-petition lawsuits, *Achecar v. Renaissance,* and *Pignatelli v. Renaissance* (collectively the "Renaissance Litigation"), in which the Debtor, the Claimant, and a number of other entities and persons were named as defendants.

7. In his subsequent submissions, the Claimant has asserted that he suffered damages as the result of (i) the Debtor's legal malpractice in the preparation of private placement memoranda (the "PPMs") for two real estate projects located in Atlanta, Georgia involved in the Renaissance Litigation and (ii) the Debtor's common law fraud in failing to disclose material information in the PPMs. The Claimant has computed his damages to be in the amount of $4,615,290 consisting of $1,350,000 in litigation-related expenses and $3,265,290 in business losses. The litigation-related expenses are for the Renaissance Litigation in which he appeared *pro se.* The Claimant computed his litigation-related expenses on the basis of a rate of $150 for the 11,000 hours he estimates he has spent defending the Renaissance Litigation. The business losses consist of the Claimant's calculation of the loss of business that he asserts has resulted from the failure of the projects, resulting litigation and adverse publicity.

### The Objection to the Claim

8. The Malpractice Representative filed an objection (the "Objection") to the Claim and sought to have it expunged or, alternatively, estimated at $0.00. The Objection was based on the following grounds: (i) the Claimant did not have standing to assert a malpractice claim against the Debtor; (ii) the Debtor did not contractually agree to indemnify the Claimant; (iii) the Claimant's alleged damages were not caused by any alleged negligence by the Debtor; and (iv) assuming, *arguendo,* that the Debtor committed fraud, the Claim was therefore not allowable as a malpractice claim. Since an issue remained as to whether the Claim would be allowable as a general unsecured claim if it were disallowed as a malpractice claim,[2] the Trustee was directed to appear and be heard with respect to the Objection. The Trustee supported the Objection. The Objection based on the Debtor's alleged legal malpractice requires this court to determine whether a stockholder of a corporation which is a third party as to the Debtor law firm is within the limited class of persons to whom the Debtor law firm could be held liable for malpractice. The court is also called upon to determine whether the Debtor's actions constituted common law fraud against the Claimant. Although the common law fraud claim would be classified in a different category than the

---

2. The confirmed plan is complicated. Claims have been separated into a number of classes. The Claim, if allowed, would be either a Class 3C or Class 3D claim. Class 3C is comprised of allowed unsecured claims. Class 3D consists of allowed malpractice claims. Malpractice claims are those claims arising out of any act, error or omission in connection with rendering or failing to render professional legal service, or any other liability or cost covered by one of the Debtor's malpractice policies. Claims against the Debtor that are not of a type covered by a malpractice policy are classified as general unsecured claims and treated as Class 3C claims. Fraud claims are not classified as malpractice claims because the malpractice policies exclude coverage for fraud. A malpractice claims trust was created in the plan which has been funded, *inter alia,* by recoveries from the Debtor's various malpractice policies. Generally speaking, payments on malpractice claims will exceed those on unsecured claims.

malpractice claim, in the context of this case, the court finds that due to the commonality of facts and in the interests of judicial economy, the court will address both of these claims in a single opinion.

9. This is a contested matter within the meaning of Bankruptcy Rule 9014. All parties have made extensive factual and legal submissions. No evidentiary hearing has been held. The court has advised the parties that it will treat the present submissions as a motion for summary judgment under Bankruptcy Rule 7056.

10. These findings of fact are based on either the record of this bankruptcy case or the submissions of the parties in this contested matter.[3] As to those facts based on the submissions of the parties, the court makes these findings based on its extractions of the material undisputed facts after a careful examination of the voluminous papers filed by both parties.[4] The court finds the limited

3. Summary judgment is an easier concept to grasp as a matter of jurisprudential philosophy than as a matter requiring practical application. None of the parties has provided the court with a concise but complete statement of undisputed facts untainted by the inclusion of what are really conclusions of law. *See* Local Bankruptcy Rule 13(g). A complete statement should include such facts as are asserted to be relevant and material by an adversary, if undisputed, whether or not there is an agreement on relevancy or materiality. *Compare* F.R.Civ.P. 52(a).

4. Attached as exhibits to the Objection are copies of the broker-dealer sales agreements for the two real estate projects, the Claim, a copy of the Claimant's May 15, 1991 letter explaining the basis of the Claim and a copy of a brochure describing the Corporation and its business. At the hearing on the Objection, the Claimant attempted to offer to the court several boxes of binders containing what he characterized as support for his Claim. Since it appeared that the issue should be addressed first by way of summary judgment, which precludes the court from determining disputed issues of fact, the court declined to accept the proffered boxes. The court directed the Claimant to make a more limited post-hearing submission. Although the Claimant is *pro se,* he is knowledgeable about the controlling legal theories as he has devoted thousands of hours to the Renaissance Litigation. The Claimant subsequently submitted:

(a) One (1) post-hearing binder (Document 2097) which contained 5 exhibits including (i) a summary of his due diligence for the Granada offering; (ii) a summary of his due diligence for the Peachtree offering; (iii) a flow chart to illustrate the offerings; (iv) pages 9 and 10 from his March 10, 1992 brief to this court highlighting his allegations against the Debtor; and (v) a copy of the Georgia Supreme Court case of *Badische Corp. v. Caylor,* 257 Ga. 131, 356 S.E.2d 198 (1987).

(b) The Claimant referred the court to two previously submitted binders which encompass the Claimant's Objection to Hearing on Claim No. 281 and *Response to Affidavit of Malpractice Representative* (Documents 1853 and 1854, respectively, collectively to be referred to as "Claimant's Objection").

(i) As part of Document 1853 (Binder 1), the Claimant attached 6 exhibits. Exhibits A and B list the trial schedule for the Georgia Litigation; Exhibit C is a record of the Claimant's activities and discussions with the Trustee, the Malpractice Representative and other interested parties in connection with this case; Exhibit D is a copy of a form letter the Claimant sent to seventy-nine (79) of the Debtor's other malpractice claimants, the Trustee, Trustee's Counsel, Counsel to the Secured Creditors' Committee and the United States Trustee; Exhibit E is a copy of a brief filed by the Claimant in support of the FDIC's Application for the Appointment of an Official Committee to Represent the Interests of All Legal Malpractice Claimants and in Objection to the Appointment of a Legal Malpractice Representative; and Exhibit F is a letter to the Claimant from *Counsel to the Malpractice Representative* disputing the Claim.

(ii) As part of Document 1854 (Binder 2) the Claimant attached two letters and a group of exhibits. Letter 1, was a copy of a letter to the Claimant from Counsel to the Malpractice Representative disputing the Claim and setting forth the reasons therefore; Letter 2 is the Claimant's response to Letter 1 objecting to the Malpractice Representative's characterizations; and the group of exhibits, which were not individually tabbed, includes exhibits presented in the Georgia Litigation, the Corporation's brochure, copies of the sales agreements for the properties and month by month time sheets documenting the Claimant's preparation and defense of the Georgia Litigation.

(c) The Claimant further referred the court to one previously submitted brief (Document 2096) entitled "April 22, 1992 Brief in Response to the Court's Observation of March 18, 1992 With Respect to Malpractice Claim No. 281" ("Claimant's Response"). Attached to this brief are twenty (20) exhibits, which include letters between the Claimant and the Malpractice Representative's counsel regarding the Claim, papers the Claimant filed in connection with the Georgia Litigation, a history of the Georgia Litigation, orders signed by the District Court for the Northern District of Georgia in connection with the Georgia Litigation, timesheets and worksheets compiled by the Claimant to illustrate the time he spent preparing and defending himself in the Georgia Litigation, various brochures about the Corporation, a resume of the Claimant, and fi-

facts this court views as material are undisputed. These findings of fact are intended to be read only in conjunction with the court's conclusions of law in this contested matter.

### The Renaissance Litigation

11. Renaissance Investment Corporation ("Renaissance"), a Georgia corporation, was the general partner of three limited partnerships: Granada, 696 Peachtree ("Peachtree") and St. Andrews. These three partnerships were formed to acquire, renovate and operate historic or preservation-worthy real estate in Atlanta, Georgia.

12. In November 1985, the Corporation entered into broker/dealer sales agreements (the "Sales Agreements") with Renaissance to market Granada, Peachtree and St. Andrews limited partnership interests. The Corporation was one of twenty-four broker/dealers for these limited partnership interests. It was the only one of the broker/dealers located in Atlanta.

13. Renaissance hired the Debtor to serve as special securities and tax counsel and to prepare the PPMs for Granada and Peachtree. The Debtor did not prepare the PPMs for the St. Andrews offering.

14. The PPMs prepared by the Debtor for Granada and Peachtree did not disclose any material judgments, liens, claims or proceedings against Renaissance, the partnerships or their properties. Some time after distribution of the PPMs, but before the closing of either transaction, the existence of a 1975 cease and desist order against one of the Renaissance principals for violations of Georgia securities law became known to the Debtor. The Debtor subsequently prepared addenda to amend the PPMs.

15. The Granada and Peachtree offerings closed in December of 1985.

16. The Claimant relied on an indemnification clause in the Sales Agreements for his original assertion that the Debtor agreed to indemnify him for any damages resulting from his participation in the marketing of the Granada and Peachtree partnerships. The Claimant has subsequently abandoned this basis for his Claim since the Debtor was not a party to any of the Sales Agreements. Indeed, although the Claimant signed the Sales Agreements on behalf of the Corporation, the Claimant himself was not a party to the Sales Agreements in his individual capacity. The indemnification clause provides that the respective partnerships will indemnify their sales agents for certain losses.

17. By mid–1986 Granada and Peachtree had defaulted on construction and rehabilitation loans. Renaissance, due to its own insolvency, was unable to cover the partnerships' liabilities to the lenders. Granada and Peachtree were placed into bankruptcy and the lenders foreclosed on their real estate.

18. In 1987, a large group of the persons who had invested in the limited partnership interests (the "Investors") instituted the Renaissance Litigation in the United States District Court for the Northern District of Georgia (the "Georgia Court"). The defendants included Renaissance, both its related entities, the Corporation and the Claimant, as well as other broker/dealers and various Renaissance legal and financial advisors, including the Debtor.

19. The Investors alleged that the defendants intentionally failed to disclose the true financial and legal position of Renaissance to the Investors. The Investors also alleged violations of Section 10(b) of the Securities Exchange Act of 1934 as well as common law

nancial statements of the Corporation for the years ended December 31, 1984 through 1988.

(d) Subsequent to his initial post-argument submission and on February 24, 1993, the Claimant also submitted a five (5) volume Supplemental Memorandum of Fact and Authority in Support of his Claim (Documents 2104–2108).

(i) Volume 1 (Document 2104) provides the Claimant's update of events from May 13, 1992 through February 1993. This includes a record of time the Claimant spent preparing and defending the Georgia Litigation, an update as to the

Georgia Litigation, designations of depositions of partners of the Debtor regarding the Debtor's due diligence procedures in preparing the PPMs, an overview of the record in the Georgia Litigation and additional authority in support of the Claim.

(ii) Volumes 2 through 5 (Documents 2105, 2106, 2107 and 2108, respectively) contain thirty-three (33) exhibits which includes discovery materials prepared in connection with the Georgia Litigation as well as partial transcripts of the trial held therein.

fraud and violations of the Georgia securities law. The Investors further alleged that the Claimant, among others, violated Section 12(2) and Section 15 of the Securities Act of 1933 (the "1993 Act").

20. The primary allegations against the Claimant were that although he represented to the Investors and their accountants that he had performed due diligence on all the offerings, he either failed to discover the precarious condition of Renaissance and its real estate operations or fraudulently concealed it from the Investors. The Investors argued that a reasonable investigation would necessarily have uncovered the true conditions.

21. The primary allegations against the Debtor were that the Debtor, as special securities counsel, knew or should have known the true legal and financial state of Renaissance and the various partnerships, and that the Debtor allowed both the Granada and Peachtree transactions to close despite numerous irregularities and unfulfilled closing conditions.

22. During discovery in the Renaissance Litigation, it was demonstrated that Renaissance was essentially insolvent as early as the summer of 1985. Furthermore, Renaissance and the partnerships and their real estate holdings were subject to a lengthy list of claims, liens and judgments that were not disclosed in the PPMs. The proceeds of the private placements and related transactions had been commingled with the funds of other Renaissance syndications and affiliates. Renaissance had also withdrawn substantial funds from the partnerships to which it was not entitled.

23. Eventually, the Investors were granted summary judgment on their securities fraud claims against Renaissance and its principals. The actions were stayed as against the Debtor due to the Debtor's bankruptcy case. The Investors' claims against the Debtor were settled pursuant to a settlement agreement approved by this court on February 3, 1992 and were allowed in an agreed amount as malpractice claims.

24. A default judgment was entered in the Renaissance Litigation against the Cor-

poration which was unrepresented by counsel. In March 1993, the Claimant was also found liable to the Investors in the Renaissance Litigation. The Claimant was held to be strictly liable under Georgia securities laws to those Investors to whom he sold Renaissance securities because of inadequate disclosure made in the St. Andrews offering as to financial statements and because of inadequate disclosure made in the Granada offering as to the intended use of proceeds.

## DISCUSSION

### STANDARDS GOVERNING ALLOWANCE OF CLAIMS, CHOICE OF LAW AND SUMMARY JUDGMENT

■ Any creditor may file a proof of claim. *See* Bankruptcy Code § 501(a). A claim which is filed is deemed allowed unless a party in interest objects. *See* Code § 502(a). A proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes *prima facie* evidence of the validity and amount of the claim. If an objection is made, the court is to determine the amount of the claim and allow the claim except to the extent that the claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because the claim is contingent or unmatured. *See* Code § 502(b)(1). Any contingent or unliquidated claim is to be estimated for the purpose of allowance if the fixing or liquidation of the claim would unduly delay the administration of the case. *See* Code § 502(c)(1).

■ Since there is no agreement or contract between the Claimant and the Debtor on which any claim could be based, the crux of the issue raised by the Objection is whether the Claimant has an enforceable claim against the Debtor under applicable law. All parties have agreed that the law of Georgia is the applicable law. This court concurs that the law of Georgia is controlling. A federal court sitting in a diversity case applies the substantive law of the forum state. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under New York's "substantial relationship" test for choice-of-law questions, Georgia law applies. All significant events relating to the alleged

malpractice and common law fraud took place in Georgia.

This is a contested matter which is governed by Bankruptcy Rule 9014. A number of the rules which apply in an adversary proceeding, including Bankruptcy Rule 7056 which incorporates F.R.Civ.P. 56 ("Rule 56"), are also applicable in a contested matter. *See* Bankruptcy Rule 9014.

 Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court cannot resolve disputed issues of fact. If the court finds a genuine dispute exists as to the material facts, the court must deny the motion. Summary judgment is appropriate only to resolve disputed questions of law, or the application of the law to the undisputed facts. A fact is material only if it affects the result of the proceeding. A fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re Tikijian,* 76 B.R. 304, 313 (Bankr.S.D.N.Y. 1987). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of material fact to be tried, and not to resolve any factual disputes. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. at 2510; *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983); *In re Ross,* 64 B.R. 829, 836 (Bankr.S.D.N.Y.1986).

For the reasons more fully set forth below, the Court finds that the only disputes are ones relating to questions of law and the application of the law to the undisputed facts. Thus this matter can appropriately be disposed of by summary judgment.

### *STANDING*

The Malpractice Representative has asserted that the Claimant lacks standing to assert the Claim. The Claimant has vigorously opposed this assertion.

Fortunately, the dispute is one without significance. There is no question but that the Claimant has standing to raise the legal questions presented in this contested matter. The court has never denied him the right to appear and be heard. However, standing of that sort does *not* mean that the Claimant must then have an allowable claim. Rather, that type of standing refers to the right, or the ability, of the Claimant to insist on the court adjudicating his rights, an insistence that requires the claimant to have a sufficient nexus with the matter to be within the zone of persons who might have such a claim. The Malpractice Representative has never objected to the Claimant being heard with respect to the Claim. The Malpractice Representative has not used the word standing in that sense but rather in the sense that the Claimant does not have an ultimate legal right to recovery.

 The merits of the claims for relief contained in the Claim are discussed in the following sections. The Claimant has asserted that his personal losses give him legal standing. While the absence of actual damages may preclude recovery, the presence of actual damages will not of itself give rise to a right of recovery. The law holds some people to be too remote from the act and actor to be entitled to recover without regard to their actual damages.

### *THE APPLICABLE LAW ON LEGAL MALPRACTICE*

 As with any other type of negligence claim, in order to establish a claim for professional negligence, or malpractice, a plaintiff must show:

"(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against reasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the

legally protected interest as a result of the alleged breach of the legal duty."

*Whitehead v. Cuffie,* 185 Ga.App. 351, 352, 364 S.E.2d 87, 89 (1987) (citation omitted). Typically, an attorney is not liable for malpractice to anyone other than his client. *See Moore v. Harris,* 188 Ga.App. 251, 252, 372 S.E.2d 654, 655 (1988). However, while the requirement that there be a legal duty in order to find liability in an attorney malpractice claim is ordinarily satisfied by the contractual privity between the attorney and the client, attorneys have been held to owe a duty of reasonable care to parties who are not their clients and are not in privity with them under certain circumstances.[5] *See Orr v. Floyd,* 95 Ga.App. 401, 97 S.E.2d 920 (Ct.App.1957); *see also Simmerson v. Blanks,* 149 Ga.App. 478, 254 S.E.2d 716 (Ct.App.1979); *Ware v. Durham,* 246 Ga. 84, 268 S.E.2d 668 (1980); *Alston v. Stubbs,* 170 Ga.App. 417, 317 S.E.2d 272 (Ct.App.1984).

Specifically, professionals, including attorneys,

"who supply information during the course of his or her business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was *manifestly aware of the use to which the information was to*

be put and intended that it so be used. This liability is limited to a foreseeable person or class of persons for whom the information was intended either directly or indirectly. If it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party can attach."

*Badische Corp. v. Caylor,* 257 Ga. 131, 133, 356 S.E.2d 198, 200 (1987) (emphasis in original).

The Georgia cases defining the limited class of third parties who can justifiably rely on the information provided by a professional involve both (i) a direct connection between the information provided by the professional and the third party's decision to act on that information, and (ii) the professional's knowledge that the third party would so act.[6] For example, in *Kirby v. Chester,* 174 Ga.App. 881, 331 S.E.2d 915 (Ct.App.1985), Jones asked Kirby to lend him approximately $60,-000 which was to be secured by two parcels of real property. Chester, who was Jones' attorney, certified to Kirby by "attorney's certification and opinion" dated the day before closing and again a month later, that title to the two parcels was held by Jones. Chester "understood that the purpose of his employment by his client * * * was to certify title to Kirby so that Kirby would provide the client Jones with the loan." *Id.* at 916. The

---

5. An interesting question arises as to whether such a legal malpractice claim speaks in tort or contract. While the claim arises out of the contractual relationship between the attorney and its client, it is bottomed on a legal duty which the attorney owes to third parties. Fortunately, the question has no practical significance in the resolution of the Objection.

6. The Georgia courts have relied heavily upon the decisions rendered in the area of third party professional malpractice by the New York Court of Appeals. The basic issues were first articulated over sixty years ago. In *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931), the New York Court of Appeals confronted the issue of whether accountants, who had negligently certified financial statements, should be liable to users of the financial statements, when the users were not in privity with the accountants. Noting that accountants are primarily responsible to those who have engaged them, rather than the public at large, the Court held that it is against public policy to hold accountants liable for a

"thoughtless slip or blunder" to the vast and undeterminable number of potential investors, lenders and stockholders. *Id.* at 181, 174 N.E. 441.

The New York Court of Appeals revisited the issue in *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985). In *Credit Alliance,* the Court of Appeals, while expressly approving *Ultramares,* went on to articulate the criteria that must be met before a professional may be held liable for the negligence to third parties. First, the professional must have been aware that the information he prepared was to be used and relied on by a known party for a particular purpose. In addition, there must have been conduct by the professional linking him with the party who relied on the information and evidencing that the professional understood that the party would rely on the information. *Id.* at 553–54, 483 N.E.2d 110, 493 N.Y.S.2d 435. *See also European American Bank v. Strauhs & Kaye,* 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985).

court found liability as there was no doubt that Kirby would rely on Chester's certification in providing the loan. *Id.* at 920. In fact, the certification was required for the sole purpose of inducing Kirby to make the loan to Chester's client.

Similarly, in *Robert & Co. Assoc. v. Rhodes–Haverty Partnership,* 250 Ga. 680, 300 S.E.2d 503 (1983), the Georgia Supreme Court expanded the scope of liability for professional malpractice to engineers and held that when an engineer issues a report on the condition of a building and knows that prospective purchasers could rely on his report, "a lack of privity will not shield the engineer from liability to a limited class of third parties. That class is the foreseeable prospective purchasers." *Id.* at 503. In reaching its holding, the Georgia Supreme Court adopted the rule first enunciated in the *Restatement of Torts, 2d,* Section 552 (1977) (the *"Restatement"*) which limits liability to a foreseeable person or limited class of persons for whom the information was intended, either directly or indirectly. *Id.* at 504.

In *Travelers Indemnity Co. v. A.M. Pullen & Co.,* 161 Ga.App. 784, 289 S.E.2d 792 (Ct. App.1982), a Georgia court of appeals denied the defendant accounting firm summary judgment on a negligence claim because Travelers alleged that the accountants had been told by their client that Travelers would rely on those financial statements in deciding whether to issue new performance bonds. The court stated with regard to the privity requirement that "a third party is entitled to recover from an accountant, despite the absence of privity, where the third party is in a limited class of persons known to be relying upon representations of accountants * * * [and the] Georgia courts have held that persons performing professional and skilled services are required to exercise ordinary care in the performance of those services and that duty may extend to persons with whom the professional is not in privity." *Id.* at 795. As in *Kirby* and *Robert & Co.,* the professionals providing the information were alleged to have actual knowledge that one of the purposes of the financial statements was to induce that third party, Travelers, to issue a bond.

In *Badische, supra,* the Georgia Supreme Court specifically rejected the notion that professional liability for negligence will attach "to an unlimited class of persons whose presence is merely 'foreseeable.'" *Badische,* 356 S.E.2d at 200. The court discussed the factors that should be considered in making a determination as to whether the alleged reliance by a third party was justifiable, stating "we will look to the purpose for which the report or representation was made. If it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party will attach. If such cannot be shown there will be no liability in the absence of privity, wilfulness or physical harm or property damage." *Id. (quoting Robert & Co.,* 300 S.E.2d at 504).

Having set forth the guiding legal principles, it is necessary to apply them to the facts underlying the Claim. For the purposes of this decision, the court assumes that the Debtor committed legal malpractice in issuing the opinion letter. It is undisputed that the Claimant was not the Debtor's client. For the reasons which follow, the court concludes that the Claimant is not within the ambit of third parties who were entitled to rely on the Debtor's opinion letter. The Debtor's opinion letter was issued in connection with the PPMs. The PPMs were prepared for the purpose of inducing *investors* to rely on the information contained therein and to act upon that reliance by investing money in the respective Renaissance partnerships. The Claimant was not an investor in the limited partnership interests.

Indeed the Claimant was not even a seller of limited partnership interests. He was simply a majority stockholder and officer of the Corporation, which was a broker/dealer for the limited partnership interests. This court holds that the indefinite class of stockholders of selling agents and broker/dealers are not within the scope of persons for whom the Debtor's opinion letter was intended directly or indirectly.

The Claimant has also urged two other positions in support of his claim of legal malpractice. First, that the Claimant's status as a control person relative to the Corporation places him within the class of protected third parties. The second position is that the court should treat the Corporation and the Claimant as interchangeable by piercing the corporate veil.

The control person argument stems from the allegations in the Renaissance Litigation against the Claimant based on violations of Section 12(2) and Section 15 of the 1933 Act.[7] Section 15 of the 1933 Act provides that one who "controls" a person who has violated Sections 11 or 12 of the 1933 Act may be held jointly and severally liable for the alleged violation, unless the "controlling person" had no knowledge of the facts by reason of which the liability of the "controlled person" is alleged to exist.

The Claimant has urged that he relied on the PPMs prepared by the Debtor in marketing the Granada and Peachtree offerings and that the Debtor's failure to disclose material information was the proximate cause of his damages. However, the Claimant has failed to rebut effectively the Malpractice Representative's argument that, assuming the PPMs were negligently prepared, the Claimant had an independent duty to discover and disclose those facts which were "reasonably ascertainable." *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1227 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981).[8]

In demonstrating an independent duty to discover and disclose by the broker/dealer, the Second Circuit, in *Hanly v. S.E.C.*, 415 F.2d 589 (2d Cir.1969), has stated:

"Brokers and salesmen are 'under a duty to investigate, and their violation of that duty brings them within the term 'willful' in the Exchange Act.' Thus a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant. He must analyze sales literature and must not blindly accept recommendations made therein * * *

* * * the standards by which the actions of each petitioner must be judged are strict. He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his investigation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information." 415 F.2d at 595–96, 597.

Therefore, as a "controlling person" of a broker/dealer under Section 15 of the 1933 Act, the Claimant also had a duty to act as a fiduciary for the investing public. This standard demands that "control persons" and other participants in distributing securities exercise due diligence in carrying out their duties toward the Corporation and the investing public. *See Securities and Exchange Commission v. National Bankers Life Insurance Company,* 334 F.Supp. 444 (N.D.Texas 1971). *See also Sanders,* 619 F.2d at 1227. The independent duty of a broker/dealer to investigate the offerings it markets bars the Claimant from arguing that

7. These sections are found 15 U.S.C. §§ 77l(2) and 77o, respectively.

Section 77l(2) states: "Any person who offers or sells a security * * * by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading * * * shall be liable to the person purchasing such security from him * * *."

Section 77o states: "Every person who, by or through stock ownership, agency, or otherwise * * * controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."

8. This duty to investigate provides the basis for broker/dealer liability under the securities laws and, in fact, the performance by a broker/dealer of this duty is a defense to liability under Section 12(2) of the 1933 Act.

his alleged reliance on the Debtor to perform this investigation was reasonable. Broker/dealers are charged with obtaining this information and are not entitled to rely on others. In fact, the Georgia Court rejected the Claimant's contention that he should escape liability because he exercised reasonable care and lacked scienter and ruled that the Claimant was *strictly liable* to the Investors for the failure of the offering materials to adequately disclose material financial data and encumbrances.

The control person argument as presented by the Claimant is an interesting, but ultimately unavailing, variant of the shareholder argument. Since not all shareholders of a broker/dealer are control persons, acceptance of the argument by the Claimant that as a control person he is in the protected class of third parties would result in (1) allowing less than all shareholders of the Corporation having a right of recovery and (2) give a right of recovery only to those shareholders who also have direct and personal liability as control persons. Therefore, adopting the Claimant's position and allowing recovery by control persons would be an anomaly as only those the law holds most responsible could recover and the most innocent would be left with no right of recovery. In addition, the class of control persons is uncertain and determined only after the fact. Furthermore, the Claimant's control person argument would obviate the foreseeability and predictability mandated by *Badische, supra.* Just as a stockholder of a non-client corporation is not within the limited class of persons to whom the Debtor owes a legal duty, a "control person" is similarly not within this circumscribed group.

■ Having disposed of the Claimant's control person argument, the court will turn to the argument that the corporate veil should be pierced. The Claimant actually raises a reverse piercing argument in that he seeks to pierce from the individual into the corporation when he suggests that there is no separate legal existence between himself and the corporation.

■ The cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and stockholders. *Raynor v. American States Insurance Company,* 176 Ga.App. 564, 337 S.E.2d 43 (Ct.App.1985). This distinction is not dependent upon the number of shares a corporation has outstanding nor is it dependent upon who owns such shares. Whether a corporation has issued one share or one million shares, whether it is publicly traded or privately held, whether it has thousands of stockholders or is wholly owned, it has a legal existence separate and distinct from its stockholders. *See Barnes v. Finnegan Enterprises,* 150 Ga.App. 430, 258 S.E.2d 55 (Ct.App.1979) (sole ownership of a corporation by one person or another corporation is not a factor).

It has been held that persons who create a corporation in order to enjoy advantages flowing from the existence as a separate entity are not entitled to have the corporate entity disregarded in situations where it works as a disadvantage to them. *Jonas v. State,* 19 Wis.2d 638, 121 N.W.2d 235 (1963); *see also Schenley Distillers Corp. v. United States,* 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1946) (corporate form will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person); *Maley v. Carroll,* 381 F.2d 147 (5th Cir.1967); *Gregory v. Garrett Corp.,* 578 F.Supp. 871 (S.D.N.Y.1983). *See also Farmers Warehouse of Pelham, Inc. v. Collins,* 220 Ga. 141, 150, 137 S.E.2d 619 (1964); *Amason v. Whitehead,* 186 Ga.App. 320, 367 S.E.2d 107, 108 (1988); *Ellis v. Edwards,* 180 Ga.App. 301, 348 S.E.2d 764 (1986); and *Earnest v. Merck,* 183 Ga.App. 271, 273, 358 S.E.2d 661 (1987). The Claimant's reverse piercing argument appears to be an effort to get around his inability to represent the Corporation and the Corporation's failure to file a proof of claim. No facts have been put forth that would warrant reverse piercing.

Based on the analysis set forth regarding the law of malpractice as it relates to the Claimant, the court concludes that the Malpractice Representative's objection to the allowance of the Claim as a malpractice claim is well-founded and should be sustained.

Now that the court has disposed of the Claim insofar as it is predicated on a theory of legal malpractice, the court will turn to consideration of the allowability of the Claim as one for common law fraud.

## THE COMMON LAW FRAUD CLAIM

■ The Claimant has alleged that the Debtor acted in a manner which constituted "gross negligence and severe recklessness constituting common law fraud." The Claimant alleges, *inter alia*, that the Debtor (i) supplied false information for the guidance of the Claimant in his business transactions, *Claimant's Objection* at 13; (ii) failed to disclose a number of mortgages on the Renaissance properties, *Claimant's Objection* at 10; (iii) filed misleading Form D statements with the Securities and Exchange Commission; and (iv) substituted "on December 31, 1985 (in transactions considered to be the use of 'mirrors'), a deceptive * * * interim working capital loan which accomplished nothing, *in place of* the working capital loan to be provided (as disclosed in the private placement memorandum prepared by [the Debtor])", *Claimant's Objection* at 9 (emphasis in original).

■ The five elements of common law fraud under Georgia law are (i) a false representation made by the defendant; (ii) scienter; (iii) an intention to induce the plaintiff to act or refrain from acting in reliance on the defendant's representations; (iv) justifiable reliance by the plaintiff; and (v) damage to the plaintiff. *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499 (11th Cir.1989), *reh'g denied*, 896 F.2d 560, *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990); *Butler v. Terminix Intern, Inc.*, 175 Ga.App. 816, 334 S.E.2d 865 (Ga.App.1985). *See also* O.C.G.A. § 51–6–1. The Claimant has failed to offer proof sufficient to satisfy two of these required elements: (1) scienter and (2) justifiable reliance. Although it is not therefore necessary to consider the other three elements, it is worth noting that it seems unlikely that the Claimant would be successful in meeting his burden of proof as to the requirements of intentionality [9] and damages.[10]

### A. Scienter

■ This court finds that the Claimant is fatally unable to prove this element. Nothing in the Claimant's voluminous papers provides any factual basis for a finding that the Debtor had the requisite scienter to be held liable for common law fraud. There must be some factual basis for conclusory allegations of intent. Allegations of scienter are sufficient if supported by the facts giving rise to a "strong inference" of fraudulent intent. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990) (*quoting Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988)).

**9.** *Intention by the Debtor to Induce the Claimant to Act*—A required element of common law fraud is that there be a showing of an intention to induce the plaintiff to act or refrain from acting in reliance on the defendant's representation. The Claimant has presented no evidence that the Debtor's representations were made for the purpose of inducing *the Claimant* to rely on those representations and to act on that reliance. The Claimant was not the Debtor's client. The Debtor's opinion was issued in connection with the PPMs. The PPMs were certainly prepared for the purpose of inducing *investors* to rely on the information contained therein and to act upon that reliance by investing money in the Renaissance partnerships.

**10.** *Damages*—
As previously stated, the Claimant has calculated his damages to be in the amount of $4,615,-290 consisting of $3,265,290 in business losses and $1,350,000 in litigation-related expenses. The litigation related expenses consist exclusively of a calculation based on the Claimant's personal efforts in representing himself *pro se*. It is unlikely, however, that a court would find that the Claimant's *pro se* litigation-related expenses are recoverable even if his fraud claim were allowed by the court. *See Kay v. Ehrler* 499 U.S. 432, 435, 111 S.Ct. 1435, 1436, 113 L.Ed.2d 486 (1991) (where attorney representing himself *pro se* was denied his request for fees and costs under section 1988 of the Civil Rights Attorneys Fees Awards Act, the court held that "the Circuits are in agreement * * * on the proposition that a *pro se* litigant who is not a lawyer is not entitled to attorney's fees"). As to the Claimant's business expenses, there is nothing to suggest that his business losses were caused principally by the Debtor's actions and/or omissions rather than by the generally adverse publicity caused by the fact that the Claimant was named a defendant in the Renaissance Litigation and has subsequently had a judgment entered against him.

A common method for establishing a strong inference of scienter is to put forth facts showing a motive for committing fraud and a clear opportunity for doing so. *Beck*, 820 F.2d at 50.

The Claimant has failed to put forth any evidence from which an inference could be drawn that the Debtor knew that its representations with respect to the properties were false when made or were made with reckless disregard for the truth, nor has the Claimant put forth any facts which establish a motive for the Debtor to commit the alleged fraud. Although the Claimant repeatedly characterizes the Debtor's actions as "severe recklessness constituting common law fraud," *Claimant's Response* at 2, 6, 9, 20, 21, 25, mere generalities and conclusory allegations of that sort are insufficient to defeat a motion for summary judgment no matter how frequently repeated. *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972).

### B. *Justifiable Reliance*

The Claimant has failed to demonstrate that his reliance on any acts or representations of the Debtor was justified, especially in light of the fact that the Claimant has not demonstrated that the Debtor's representations were made for his benefit. As a broker/dealer, the Claimant was under an independent duty to discover and disclose those facts which were "reasonably ascertainable." *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1227 (7th Cir.1980). This duty to investigate provides the basis for a broker/dealer's liability under the securities laws. Certainly, recorded liens on a property are "reasonably ascertainable" to anyone willing to do a title or lien search.

Therefore, the objection to the claim as one for common-law fraud is also well-founded and the Claim must be disallowed. The Claimant has failed to offer facts, which if proven at trial, would be sufficient to sustain the common law fraud claim.

### CONCLUSION

This court has found that the Claim, whether considered as one for legal malpractice or as one for common law fraud, cannot be allowed as a matter of law based on the undisputed facts. It is therefore unnecessary for this court to estimate the Claim.

The Malpractice Representative is directed to settle an appropriate order.